745 So.2d 330 (1998)
Ira FOX, Appellant,
v.
McCAW CELLULAR COMMUNICATIONS OF FLORIDA, Inc., d/b/a Cellular One; Advanced Cellular Systems, Inc.; Vern's Enterprises, Inc., d/b/a Vern Electronics; Almac Communications, Inc.; Radiotronics, Inc.; Metro Cellular Inc.; Central Cellular, Services, Inc.; Florida Cellular, Inc.; and Ronald Hickenbotham, Appellees.
No. 97-2052.
District Court of Appeal of Florida, Fourth District.
December 9, 1998.
*331 Donald S. Hershman of Donald S. Hershman, P.A., Boca Raton, and Rick A. Saturn of Law Offices of Rick A. Saturn, Defray Beach, for Appellant.
David P. Ackerman and Julie E. Fox of Ackerman, Link & Sartory, P.A., West Palm Beach, for Appellee McCaw Cellular.
PER CURIAM.
This case involves an offer of judgment in the amount of $100. The trial judge found it in good faith and awarded fees. We affirm the award because the record fully supports the determination but write to address "nominal"[1] offers of settlement *332 under section 768.79.[2]
Plaintiff was employed by Florida Cellular, an AT & T Wireless Services dealer. He alleges that when AT & T terminated the dealership Florida Cellular sold its business to another AT & T dealer and that he was fired within one week. He was hired by a different AT & T dealer but within three days he was also terminated there. He filed suit against several defendants alleging that they had combined to prevent him from getting a job with any AT & T dealer. His complaint alleged causes of action for group boycott under Florida antitrust law, defamation, and interference with a contract.
Defendants first responded with a motion to dismiss the complaint on the basis that it failed to state a cause of action.[3] Along with their initial response, they also served an offer of judgment under section 768.79, Florida Statutes (1993), proposing to settle all claims for $100. Plaintiff did not respond to the offer. Instead he filed an amended complaint, and defendants again moved to dismiss on identical grounds. The trial court also granted this motion. Second and third amended complaints were filed, and the antitrust claim was ultimately dismissed with prejudice.
After a fourth amended complaint was filed, defendants answered and moved for summary judgment as to the two remaining counts of defamation and tortious interference, arguing the absence of any evidence of malice to overcome their qualified privilege. The trial court granted the motion and entered final judgment. Plaintiff appealed the judgment, but the appeal was dismissed when he failed to file a brief.
Following the dismissal of the appeal, the trial court concluded that defendants were entitled to attorney's fees under section 768.79 on the basis of their unaccepted offer of judgment. The trial court noted that the only argument against fees was that the offer was nominal and therefore not in good faith. The court concluded that plaintiff had failed to produce any evidence of bad faith and found instead that the offer had been made in good faith. The court also found the requested fees reasonable. As we have already indicated, the record supports these findings by the trial judge.
Plaintiff argues that the offer of judgment was made with defendants' initial response to the lawsuit and before any discovery had been done. He insists that the defendants could not then have had the evidence to defeat his claims. Indeed, he points out that counsel's time sheets in support of the fees show little time spent on the case at the time of the offer, which he thus characterizes as simply a "kneejerk" reaction to the suit without any reasonable or realistic assessment of the liability and damages issues raised by his claims.
He argues that his state law antitrust claim was "by its very nature ... a very complicated cause of action" and was, he contends, to a great extent controlled by federal antitrust decisions, which he suggests were "in a state of flux and unsettled." At the time the offer was made, he argues, the offerors could not possibly have "made an accurate [e.s.] assessment of their clients' liability and based their offer accordingly in `good faith.'" He argues that our decision in Eagleman v. Eagleman, 673 So.2d 946 (Fla. 4th DCA 1996), stands for the proposition that all nominal offers are prima facie in bad faith and thus we should reverse.
We disagree. Eagleman merely holds that nominal offers are suspect where they are not based on any assessment of liability and damages. When a nominal offer is not based on an evaluation of potential liability and damages, the offer raises a question as to the intentions of the *333 offeror. In that circumstance, Eagleman holds that an issue of good faith arises for resolution by the trial court.
Our conclusion is buttressed by cases from other courts holding that nominal offers of judgment are not alone determinative of bad faith. See Weesner v. United Services Auto. Ass'n, 711 So.2d 1192 (Fla. 5th DCA 1998) (fact that offer is nominal not necessarily determinative of issue of good faith); State Farm Mut. Auto. Ins. Co. v. Marko, 695 So.2d 874 (Fla. 2nd DCA 1997) (offer of $1 treated as in good faith); and Peoples Gas System Inc. v. Acme Gas Corp., 689 So.2d 292 (Fla. 3rd DCA 1997) (offer of $2,500 in case later settled for $3.5 million not determinative of bad faith). The common thread running through the decisions is that the offerors in all of them had a reasonable basis at the time of the offer to conclude that their exposure was nominal. The history of the protracted litigation in Eagleman suggested that the offeror had purposes other than to effect a settlement between the parties and suggested that the offer was in bad faith. The claim in suit, we note, ultimately brought a jury to deadlock. Therefore, even viewing such offers with "considerable skepticism," Eagleman, 673 So.2d at 948, proof of bad faith requires a showing beyond the mere amount of the offer.
We stress that the question of good faith in making an offer under section 768.79 involves an inquiry into the circumstances shown by the entire record of the case. Each case requires its own analysis, and must be considered on its own facts. Whether an offer was made in bad faith involves a matter of discretion reposed in the trial judge to be determined from the facts and circumstances surrounding the offer. That determination is not controlled by a legal imperative requiring a finding of bad faith merely because the offer was nominal. Some nominal offers will have been made in good faith; some not so. The trial judge will have to consider all the surrounding circumstances when the offer was made.
If the cases reaching us are any guide, offers of settlement under section 768.79 are pervasive, and there is widespread disagreement among trial judges and lawyers as to the meaning of the "not in good faith" provision of the statute. One widely held belief is that a mere purpose to shift fees by making a nominal offer is indicative of bad faith under the statute. Because this issue recurs so frequently in this court, we have decided that it is necessary to certify the following question of great public importance to the supreme court:
Is a mere purpose to shift fees by making a nominal offer of settlement, regardless of the objective indications at the time of making the offer or after the final disposition of the case, alone indicative of bad faith under section 768.79?
In this instance, we affirm the trial judge's finding that this nominal offer was made in good faith because there was no showing by the offeree that it was in bad faith apart from the offer itself.
AFFIRMED.
GUNTHER and KLEIN, JJ., concur.
FARMER, J., concurs specially with opinion.
KLEIN, J., concurs specially with opinion.
FARMER, Judge, concurring specially.
I concur in the result with the following additional understanding.
The gist of the Eagleman holding is that, where an offer is shown not to rest on any reasonable assessment of liability and damages and the offer has no reasonable relationship to damages, the court should begin its assessment of the bad faith claim by viewing the offer with some skepticism. I note that this is not a broad, categorical holding to the effect that all such offers are presumptively in bad faith. Rather, Eagleman merely presents an analytical construct for the trial judge. It *334 becomes an appropriate stage in the analysis if, but only if, the conditional predicatean offer has been shown not to rest on a reasonable assessment of liability and damages and further has no reasonable relationship to damagesfor the construct has been established. Eagleman thus does not hold that all nominal offers are in bad faith, or even merely that all nominal offers are prima facie in bad faith. It simply holds that where a nominal offer is not preceded by the assessment of the claims the trial court should then consider it skeptically.
Having said that, it would seem to me a rare case that a party sued for money damages will not have made any assessment of liability and damages after receiving suit papers and before making an offer to settle the case. Moreover, a reasonable assessment of an offer requires little more than that the offeror decidebased on whatever information is then available whether the claim actually presents some exposure in liability and damages to the offeror. As we said in Schmidt the offeror need have neither the kind nor amount of evidence necessary to defeat the claim at trial. Thus an assessment might be reasonable if, as here, the offeror does little more than consider the kind of claim presented and, with his own personal knowledge of the facts, estimate the likelihood of the claimant prevailing.[4] If the offeror decides that the odds of the offeree prevailing are not good in his opinion, a nominal offer would presumptively be in good faith.
In assessing whether there is potential liability in a trial, an offeror might consider a host of factors, some of which may have little to do with the legal rights and liabilities involved in the substantive dispute. Among the other things considered when deciding whether to make an offer early in a case, the good faith offeror might properly consider the venue where the case was filed and the perception that the likely jury to be drawn there might favor him. He might also base an offer on a perceived advantage as to who the trial judge or claimant's lawyer is. Another reasonable basis could be simply to open negotiationsfor there is nothing in the statute to suggest that a defendant could not employ the section 768.79 mechanism merely to begin the process of proposals and counterproposals that often lead to a settlement. Other equally plausible foundations might be based on the offeror's financial straits and strong personal interest in settling the case at that point for as low a sum as can be negotiated, or indeed any of a host of other reasons that impel defendants to make offers of settlement.
I agree there is a wide difference of opinion as to what the legislature had in mind in adding the good faith provision to the offer of judgment statute. Yet, when the legislature crafted the statute, there was a background of prior legal precedents as to the concept embraced within those words. Because an offer under the statute is preparatory to concluding a contract, I think the legislators may appropriately be deemed to have considered cases dealing with the concept of good faith in the performance of contractual obligations. Those precedents, I contend, find a difference between contracting parties bound by fiduciary ties, on the one hand, and those who are instead dealing at arms length, on the other.
In the fiduciary category, for example, is the relationship between an insurance carrier and its insured where the carrier is obligated to represent the insured's best interests and attempt to settle the claim in good faith. If the carrier breaches the duty, the insured may sue the carrier for a bad faith refusal to settle. See, e.g., McLeod v. Continental Ins. Co., 591 So.2d 621 (Fla.1992); Blanchard v. State Farm Mut. Auto. Ins. Co., 575 So.2d 1289 (Fla. *335 1991); North American Van Lines, Inc. v. Lexington Ins. Co., 678 So.2d 1325 (Fla. 4th DCA 1996). In this situation the duty of the carrier to act in good faith with regard to the best interests of its insured requires that it do more than merely act honestly. It requires the carrier to try realistically to settle the case within policy limits and thereby limit the insured's liability to an amount of damages that is covered by the policy. Boston Old Colony Ins. Co. v. Gutierrez, 386 So.2d 783, 785 (Fla.1980) ("The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."). Thus, e.g., a $100 offer by a carrier to settle a $100,000 claim with disputed but unclear liability may conceivably amount to bad faith. In short the carrier is not free to offer a nominal amount to settle a substantial claim where to do so is reasonably likely to subject the insured to a personal judgment for the excess.
On the other hand, an example of the duty of good faith as between parties dealing at arms length is found in the UCC provision defining good faith as being synonymous with honesty. See § 671.201(19), Fla.Stat. (1997) ("`Good faith' means honesty in fact in the conduct or transaction concerned."). This court considered a comparable understanding of good faith between arms length contracting parties in Bosso v. Neuner, 426 So.2d 1209 (Fla. 4th DCA 1983). That suit involved a bad faith claim by a buyer of real estate against the seller. We there held that bad faith was:
"[t]he opposite of `good faith', generally implying or involving actual or constructive fraud, or a design to mislead or deceive another ... or sinister motive... [contemplating] a state of mind affirmatively operating with a furtive design or some motive of interest or ill will."
426 So.2d at 1212. Hence as to ordinary contracting partieswho are perforce dealing indisputably at arms lengththe duty means little more than honesty or truthfulness. It does not add obligations of the kind usually attributed to fiduciaries to act in the best interests of someone.
These principles all come together in a decision that I think is especially apt in Shuster v. South Broward Hospital District Physicians' Professional Liability Insurance Trust, 591 So.2d 174 (Fla.1992). There an insured was upset with his carrier for settling a claim within the coverage limits. The insured thought that the carrier should have "fully investigated" the claim before offering to settle within policy limits, and was upset that the carrier had settled for sums substantially in excess of what the insured regarded as the reasonable settlement value of the claim.
The Shuster court pointed out that when the carrier assumes control of settlement of a claim made against its insured, the carrier is bound by the duty of good faith to attempt to settle within policy limits "with due regard for the interests of its insured." In that setting:
"The insurer has the duty to investigate the facts and give fair consideration to the claims pending. In other words, the `insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business.'"
591 So.2d at 176 (citing Boston Old Colony Ins. Co. v. Gutierrez, 386 So.2d 783, 785 (Fla.1980)). When actually effecting a settlement within policy limits, however, the court held that the duty of good faith has a more limited meaning. "[A]n insurer's good faith discretion is broader when deciding to settle a claim within the policy limits than when refusing to settle or defend a claim." 591 So.2d at 176; see also Gardner v. Aetna Cas. & Sur. Co., 841 F.2d 82 (4th Cir.1988).
*336 The Shuster court noted that the contract itself gave the carrier the right to "make such investigation and such settlement of any claim or suit as it deems expedient." As the court explained:
"The obvious intent behind placing the provision in the agreement was to grant the insurer the authority to decide whether to settle or defend the claim based on its own self-interest, and this authority includes settling for the nuisance value of the claim. Therefore, we interpret the provision as granting the insurer the discretion to settle cases for amounts within the policy limits, regardless of whether the claim is frivolous or not." [emphasis supplied]
591 So.2d at 177.[5] The court further explained:
"We recognize that every contract requires the good faith performance of its provisions. However, the act of settling a claim either for nuisance value, or for an amount lower than the actual value of the suit, is not bad faith performance of the right to settle as one `deems expedient.' The agreement expressly granted the insurer the right to settle within the policy limits, regardless of the merits of the claims, and we believe settlements such as those in the instant case are exactly what the parties contemplated when entering into the agreement. Therefore, there is nothing in this case which demonstrates bad faith performance on the part of the insurer." [emphasis supplied]
591 So.2d at 177.[6]
Shuster is instructive to me because it involves the duty of good faith in connection with the same subject we face today i.e., good faith in making an offer to settle a lawsuit. It allows an insurance carrier bound by fiduciary ties to its insured to make a purely nominal offer to settle a lawsuit within policy limits without any consideration or evaluation of the relative strengths and weaknesses of the claimant's action. Shuster allows the offeror to offer to settle within policy limits "for nuisance value" based solely on its "own self-interest." 591 So.2d at 177. In short Shuster holds that a party who owes a higher duty to another party than is ordinarily involved between adversarial parties in civil litigation may nevertheless in good faith offer to settle a claim without investigation or evaluation, based solely on its own self interest and for a nominal amount. Shuster therefore raises considerable doubt in my mind that an adverse party without any fiduciary ties would be precluded from offering in good faith to settle a suit against itself for a purely nominal sum to establish a basis for attorney's fees later.
While I agree that the legislature intended section 768.79 to play some role in encouraging settlements, see ch. 86-160, § 2, at 699, Laws of Fla., I do not agree that encouraging settlements was the legislature's principal purpose. The statute was first adopted as part of the Tort Reform and Insurance Act of 1986. See Ch. 86-160, § 58, at 754-755, Laws of Fla. The preamble to this legislation has 14 paragraphs, many of which emphasize that the entire package of legislation was motivated by a crisis in the availability of liability insurance, the cost of which had become "excessive and injurious to the people of Florida." The legislature stated that "the current tort system has significantly contributed to the insurance availability and affordability crisis;" and that "comprehensive insurance regulatory reform and tort reform is necessary to improve the availability and affordability of commercial liability insurance."
This statement of intent is then followed by a statutory text that says:

*337 "In any civil action for damages ... if a defendant files an offer of judgment which is not accepted, ... the defendant shall be entitled to recover ... attorney's fees incurred ... if the judgment is one of no liability or the judgment obtained by the plaintiff is at least 25 percent less than such offer. ..." [emphasis supplied]
This text demonstrates that the legislature conceived of damages claims resulting in no liability being the subject of an offer of judgment under the statute. If a claim is arguably one of "no liability" or modest damages then surely the opposing party should be able to make a nominal offer to end the litigation then and there.
Nominal offers are obviously quite consistent with a purpose to discourage marginal claims, or those of small or doubtful value. Placing a price tag in attorney's fees on unaccepted offers of judgment certainly discourages the filing of some claims, namely those without clear liability or significant damages. The legislature might easily have supposed that well founded claims of greater value would not be deterred by a nominal offer because such claimants will likely recover more than nominal damages anyway. There is simply nothing in this or the remainder of the text to suggest that the legislature intended that a defendant must offer more than a nominal amount if he sincerely believes that the claim will turn out to be one of "no liability." Nominal offers are thus inherent in this statute. If nominal offers are inherent they can obviously be made in good faith.
In short, I think placing a price tag on unaccepted offers of judgment was not so much meant to encourage settlements as it was to deter the filing of some claims. Thus I think the legislature deliberately drafted this statute to allow parties to offer purely nominal amounts solely for the purpose of setting up a right to fees, so long as the offer is based on a reasonable assessment of the case and bears some reasonable relationship to the context.
The desire to set up a right to attorney's fees under an offer of judgment statute does not seem to me to be comparable to "constructive or actual fraud," or "a design to mislead or deceive another," or a "sinister motive or a state of mind affirmatively operating with a furtive design or some motive of ill will." Bosso, 426 So.2d at 1212. I do not deem making use of a statutory right to fees to be the equivalent of maliciously inflicting unwarranted financial harm on an adverse party. Again, it was undeniably a principal legislative purpose in section 768.79 to create rights to fees in connection with the bringing of some claims, for if the statute does anything else it achieves that result. It should hardly need saying that nominal offers may also enable cash poor defendants, who may not otherwise be in a position to pay a lawyer to defend the case as it progresses, to be able to obtain legal representation on a contingency arrangement, whereby the defendant's lawyer could agree to be paid by the claimant at the conclusion of the case on the basis of the unaccepted nominal offer of settlement under section 768.79.
I again emphasize the obvious anomaly that would be allowed to fester under a categorical disapproval of all nominal offers. According to the holding in Shuster, the carrier for an insured who has been sued for damages is authorized to offer a nominal sum without investigation to settle a claim against its insured, and presumably may do so under section 768.79. If nominal offers were categorically deemed in bad faith, an uninsured defendant would be precluded from offering a nominal sum under the same circumstances.
There is little reason from the statutory text to conclude that the legislature ever conceived of such an illogical distinction. From the logic of Shuster it seems highly unlikely that the legislature ever intended by the generalized term "good faith" that an adversary dealing at arms length would not be acting in good faith in offering a nominal sum under the offer of judgment *338 statute to settle a case, yet a carrier bound by fiduciary ties to its insured would be acting in good faith in offering a purely nominal sum to settle within policy limits without any assessment of liability and damages. As the legislature must be presumed to have been aware of the very narrow meaning of good faith in contract applications in crafting what became section 768.79(7), I necessarily presume that in using the words, "not in good faith," it must have had a similar concept in mind.
While I thus acknowledge this plain meaning of section 768.79(7), I nonetheless also express my uneasiness at the unfairness of allowing defendants so easily to set a predicate for fees but denying a mutual predicate in favor of claimants. For while there is no disincentive under section 768.79 for a defendant to offer a nominal sum at the very beginning of the litigation, and without any record basis for supposing that the claim is almost certain to result in a defense verdict, there is a very good reason in some cases why a claimant would usually not be able to accomplish the same effect by a functionally similar demand. For example in a personal injury case with catastrophic damages but close liability where in good faith the claimant's lawyer evaluates damages in multiples of millions but liability as evenit is not possible to demand a very low settlement amount, say $50,000. To do so gives the defendant a windfall resolution at that sum because it represents far less than the case is likely to generate after discovery, trial preparation and mediation, and trial itself. It also exposes the attorney for the claimant to a possible claim for professional malpractice. Indeed in this example and in many other kinds of claimant is unlikely to be able to demand anything less than a sum approaching the case's expected value.
There are no provisions in chapter 768 similar to those in chapter 766 requiring that a defendant investigate a claim in good faith and setting up pretrial procedures for arbitration of damages before a defendant can respond.[7] In according a right to attorney's fees for failing to accept nominal offers to settle a case, the legislature could easily have inserted provisions similar to those in chapter 766 requiring both sides with limited discovery to evaluate the claims fairly and reasonably, and to furnish corroboration of grounds both sustaining and rejecting claims. Creating a statute with one-sided offers of judgment procedures of the kind represented here does little to foster real settlements; but it is equally likely to generate only more litigation over issues of good faith, malpractice and the like. Thus, although I conclude that we are not free to read the present statutory text to hold that all nominal offers of judgment are indicative of bad faith, I hope the legislature will reconsider the current statutory basis for avoiding fees under section 768.79(7) and strike a corresponding balance in favor of claimants.
KLEIN, Judge, concurring specially.
I am concurring, rather than dissenting, because I am bound by a prior decision of this court approving a nominal offer of judgment, Allstate Insurance Co. v. Silow, 714 So.2d 647 (Fla. 4th DCA 1998). Although as a panel member in Silow I agreed with our decision upholding an offer of judgment in the amount of $100, I have now come to believe that nominal offers of judgment are not good faith offers under section 768.79, Florida Statutes (1997).
*339 I disagree with Judge Farmer's suggestion in his specially concurring opinion, that the legislature may have intended that parties could make nominal offers of settlement solely for the purpose of shifting fees. On the contrary, I believe that the purpose of the statute was to dispose of litigation at the early stages by "encouraging realistic views of the claims made." Hartford Cas. Ins. Co. v. Silverman, 689 So.2d 346, 348 (Fla. 3d DCA 1997). See also Eagleman v. Eagleman, 673 So.2d 946, 948 (Fla. 4th DCA 1996), in which we said that: "the offer should bear a reasonable relationship both to the amount of damages and a realistic assessment of liability."
Allowing courts to find nominal offers to be in good faith, in my opinion, gives defendants a highly unfair advantage over plaintiffs. Defendants can make nominal offers of judgment in every case, with nothing to lose other than the amount of the nominal offer. Plaintiffs, on the other hand, cannot make offers of settlement for less than what they are actually willing to accept. Allowing nominal offers thus allows defendants to shift fees at virtually no cost, with no corresponding right for plaintiffs.
Consider, for example, a plaintiff in a medical malpractice or products liability case with over a million dollars in damages. Attorneys' fees for defendants in these cases, which can take weeks or months to try, can easily run into six figures, and there are often multiple defendants. If the defendants can make nominal offers that do not bear a reasonable relationship to liability and damages, they can force the plaintiff to drop a good case and accept a nominal amount because of the risk of an adverse verdict, and the resultant liability for a six figure attorneys' fee.
In my opinion, the unfairness of construing the statute to allow nominal offers of judgment, which Judge Farmer candidly recognizes in his concurring opinion, may contravene Article I, Section 21 of the Florida Constitution which provides that: "the courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial, or delay."
In Psychiatric Associates v. Siegel, 610 So.2d 419, 424 (Fla.1992), our supreme court held unconstitutional a requirement for a plaintiff bringing an action against a medical review board to post a bond sufficient to cover defendant's costs and attorney's fees, explaining:
The right to go to court to resolve our disputes is one of our fundamental rights. With the exception of the state constitution in 1868, Florida has incorporated an express provision guaranteeing a person's right of access to the courts in each of its constitutions. The history of the provision shows the courts' intention to construe the right liberally in order to guarantee broad accessibility to the courts for resolving disputes.
See also Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), in which the United States Supreme Court observed:
[O]ne should not be penalized for merely defending or prosecuting a lawsuit, ... [T]he poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel.
This court has recognized the importance of our constitutional right of access to the courts in regard to a similar fee shifting statute, section 57.105, observing in Boyce v. Cluett, 672 So.2d 858 (Fla. 4th DCA 1996):
In light of Florida's strong policies favoring access to the courts, we have interpreted section 57.105 to provide a remedy only in cases in which the plaintiff's complaint is completely untenable.
Eliminating nominal offers would not only create a more level playing field, but would also make it easier for trial courts to determine if offers are in good faith. *340 When a defendant has to explain why a nominal offer is in good faith, the explanation may have been concocted for the hearing, rather than having existed at the time of the offer.
Although I am sympathetic to defendants faced with defending meritless claims, the benefit to be gained by allowing defendants to make nominal offers solely to shift attorneys' fees is outweighed by the unfairness to plaintiffs. And, for those defendants who are forced to defend claims which are frivolous, section 57.105 authorizes the assessment of attorneys' fees in those circumstances.
I would hold that whether an offer is in good faith should be determined by considering whether the party making the offer could reasonably have believed that the offeree would accept it in full settlement, even if there were no risk of having to pay the offeror's attorney's fees. The only circumstance I can think of in which a nominal offer would be in good faith under that standard would be where the offeree's case is so meritless that it is in the best interest of the offeree to accept a nominal offer in order to avoid taxation of costs under Chapter 57, Florida Statutes, if the offeree loses the lawsuit.
I do agree with Judge Farmer that the statute gives us little guidance as to how to deal with nominal offers. The Florida Supreme Court was confronted with a similar situation in which a statute involving contracts could have been interpreted in two ways, and resolved the conflict as follows:
Assuming that both district courts' interpretations are reasonable, given the language of the statute, the interpretation that should be applied is the one that least restricts the right to contract. This is necessary in order to give proper recognition to the constitutional prohibition against the impairment of contracts.
Palma Del Mar Condominium Ass'n v. Commercial Laundries, 586 So.2d 315, 317 (Fla.1991). Applying the rationale of Palma Del Mar to the present case, I would interpret good faith to exclude nominal offers, because that interpretation would be most favorable to the constitutional right of access to the courts.
NOTES
[1] The term nominal as a synonym for insignificant, symbolic, minimum, negligible, or token, with regard to offers of judgment has its counterpart in other areas of the law. We are accustomed to dealing with nominal damages, nominal capital, nominal parties, nominal value and nominal consideration. It is useful to denote offers of settlement where the sum offered is small.
[2] § 768.79, Fla.Stat. (1997).
[3] See Fla.R.Civ.P. 1.140(b)(6).
[4] Contrary to appellant's argument here, it is not necessary that the offeror's evaluation be "accurate" when made. The only accuracy required of good faith offers has to do with the final result in the case as regards the right to fees for unaccepted offers.
[5] The court gave as an example of bad faith a carrier representing multiple parties against a claimant where the carrier indiscriminately settles for some of its insureds within policy limits, while leaving other insureds exposed to excess judgments.
[6] The court justified its conclusion by holding that the carrier's discretion, though not absolute, is determined by the expectations of the contracting parties.
[7] See, e.g., § 766.106(3), Fla.Stat. (1997) (during 90-day presuit screening period prospective defendant and insurer shall conduct review to determine liability of defendant; at end of period defendant shall respond by rejecting claim, offering settlement, or admitting liability and arbitrating damages); and § 766.203(3), Fla.Stat. (1997) (before responding to presuit notice, defendant and insurer shall conduct investigation to ascertain reasonable grounds to believe whether defendant was negligent resulting in injury to claimant; defendant shall provide claimant with corroboration in any response rejecting claim).